TEX-PENN OIL COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

F. B. PARRIOTT, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

M. L. BENEDUM, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 11539, 30989, 30990. Promulgated August 8, 1933.

*John W. Davis, Esq., Montgomery B. Angell, Esq., Weston Vernon, Jr., Esq., J. C. Adams, Esq.,* and *Harry Friedman, Esq.,* for all the petitioners.

*John S. Weller, Esq.,* and *John O. Wicks, Esq.,* appearing in addition for petitioner Benedum.

*Brooks Fullerton, Esq., John D. Foley, Esq.,* and *Ottomar Hamele, Esq.,* for the respondent.

BEFORE ARUNDELL, VAN FOSSAN, AND LEECH.

932

938

942

944

**OPINION.**

ARUNDELL: These cases arise out of the acquisition by the Transcontinental Oil Co. of certain properties owned by the petitioners. The first issue to be decided is whether the transactions whereby

these petitioners transferred their properties to Transcontinental constituted a taxable or nontaxable reorganization under section 202 (b) of the Revenue Act of 1918 and article 1567 of Regulations 45. If the conclusion be reached that the transactions constituted a nontaxable reorganization, this will dispose of the cases and there will be no tax due. A contrary conclusion will require that other questions be decided.

The facts may be briefly summarized without attempting at this point to notice all the details or to give our construction of them. Petitioners Benedum and Parriott and their three associates were stockholders in the petitioner, Tex-Penn, a corporation. Tex-Penn owned a two-eighths interest in the Duke-Knoles oil leases in Texas and the five individuals owned a five-eighths interest in the same leases. Benedum and Parriott had interests in other properties under oil and gas leases, and they owned stock in three companies which were engaged in various phases of the oil and gas business. The Transcontinental Oil Co. was organized for the purpose of acquiring all of these properties, it being Benedum's idea that such a consolidation would result in an effective operating unit which would combine all phases of the oil business from production of the crude oil to the marketing of the refined products. Following the organization of Transcontinental, the two Riverside companies transferred their assets to it for cash and Transcontinental stock. Pittsburgh-Texas conveyed its assets to Transcontinental for stock and the assumption of its liabilities. The five individuals sold their five-eighths interest in the Duke-Knoles leases to Transcontinental for cash. Tex-Penn conveyed its two-eighths interest in the Duke-Knoles leases and its other assets to Transcontinental.

Here arises the first question. Was the consideration for Tex-Penn's property cash and stock of Transcontinental, or stock only? Though this is a question of fact to be determined upon the evidence, it is necessary, as a background, to examine the applicable taxing statute and regulations. The parties are agreed that this question is to be solved according to whether or not the facts bring the transaction under section 202 (b) of the Revenue Act of 1918 and the respondent's interpretation thereof in article 1567 of Regulations 45. The statute and regulations are set out in the margin.[1]

---

[1] [Section 202 (b), Revenue Act of 1918.] When property is exchanged for other property, the property received in exchange shall for the purpose of determining gain or loss be treated as the equivalent of cash to the amount of its fair market value, if any; but when in connection with the reorganization, merger or consolidation of a corporation a person receives in place of stock or securities owned by him new stock or securities of no greater aggregate par face value, no gain or loss shall be deemed to occur from the exchange, and the new stock or securities received shall be treated as taking the place of the stock, securities, or property exchanged.

[Article 1567, Regulations 45.] *Exchange of stock for other stock of no greater par value.*—In general, where two (or more) corporations unite their properties, by either

Article 1567 of the Regulations has been in effect in substantially the same form since its original promulgation shortly after the passage of the Revenue Act of 1918, and the parties appear to be agreed that it correctly interprets section 202 (b) of the statute and should be so accepted in solving the questions presented here. We are not disposed at this late date to question this interpretation, although it may not be amiss to point out that the validity of the provisions which allow property (other than securities) to be exchanged for securities without recognition of gain has not gone unchallenged. See *Insurance & Title Guarantee Co.* v. *Commissioner*, 36 Fed. (2d) 842.

The laws of Delaware, under which Transcontinental was incorporated, permit the issuance of no par value stock without requiring the corporation to set up an amount of capital or an amount of stock issued which may not be impaired by dividends. In view of this situation the parties are agreed that, within the meaning of article 1567, the no par stock of Transcontinental is to be regarded as having no greater aggregate or face value than the par stock of Tex-Penn. See S.M. 2244, III-2 C.B. 33.

Throughout the consideration of these cases it should be borne in mind that the statute recognizes that gain may be realized or loss sustained on exchanges of property, and where a gain is realized it is subject to tax unless specifically excepted. Section 213 specifically includes in income the gain realized from dealings in property. For the purpose of determining the amount of gain or loss on an exchange, the property received is to " be treated as the equivalent of cash to the amount of its fair market value, if any." Sec. 202 (b). It is only in the exceptional case, and where such case meets clearly the

---

(a) the dissolution of Corporation B and the sale of its assets to Corporation A, or (b) the sale of its property by B to A and the dissolution of B, or (c) the sale of the stock of B to A and the dissolution of B, or (d) the merger of B into A, or (e) the consolidation of the corporations, no taxable income is received from the transaction by A or B or the stockholders of either, provided the sole consideration received by B and its stockholders in (a), (b), (c), and (d) is stock or securities of A, and by A and B and their stockholders in (e) is stock or securities of the consolidated corporation, in any case of no greater aggregate par or face value than the old stock and securities surrendered. The term " reorganization," as used in section 202 of the statute, includes cases of corporate readjustment where stockholders exchange their stock for the stock of a holding corporation, provided the holding corporation and the original corporation, in which it holds stock, are so closely related that the two corporations are affiliated as defined in section 240 (b) of the statute and article 633, and are thus required to file consolidated returns. So-called " no-par-value stock " issued under a statute or statutes which require the corporation to fix in a certificate or on its books of account or otherwise an amount of capital or an amount of stock issued which may not be impaired by the distribution of dividends, will for the purpose of this section be deemed to have a par value representing an aliquot part of such amount, proper account being taken of any preferred stock issued with a preference as to principal. In the case (if any) in which no such amount of capital or issued stock is so required, " no-par-value stock " received in exchange will be regarded for purposes of this section as having in fact no par or face value, and consequently as having " no greater aggregate par or face value " than the stock or securities exchanged therefor.

conditions specified in the statute, that a realized gain from an exchange is not recognized for tax purposes. Some of the cases have construed the "nonrecognition of gain" provisions of this and other revenue acts as providing merely for "postponement" of the imposition of the tax (*David B. Gann,* 23 B.T.A. 999), and others as allowing "exemption" from tax. *Insurance & Title Guarantee Co.* v. *Commissioner,* 36 Fed. (2d) 842; *Pinellas Ice & Cold Storage Co.* v. *Commissioner,* 287 U.S. 462; *Cortland Specialty Co.* v. *Commissioner,* 60 Fed. (2d) 937. Whichever of these may be the correct rule in construing the statute, in any event the burden is on the taxpayer to bring itself unequivocally within the terms of the statute under which it seeks to avoid recognition of a gain.

The particular portion of section 202 (b) with which we are concerned is as follows:

* * * when in connection with the reorganization, merger or consolidation of a corporation a person receives in place of stock or securities owned by him new stock or securities of no greater aggregate par or face value, no gain or loss shall be deemed to occur from the exchange * * *.

This language has been construed by the respondent in article 1567 as including cases of the exchange of property of one corporation for stock of another. Restating article 1567 by eliminating the parts not applicable at this point, and substituting the corporate names for the letter designations, the article would read as follows:

In general, where two (or more) corporations unite their properties by either * * * (*d*) the merger of Tex-Penn into Transcontinental, or (*e*) the consolidation of the corporations, no taxable income is received from the transaction by Transcontinental or Tex-Penn or the stockholders of either, provided the sole consideration received by Tex-Penn and its stockholders in * * * (*d*) is stock or securities of Transcontinental, and by Transcontinental and Tex-Penn and their stockholders in (*e*) is stock or securities of the consolidated corporation.

It is to be noted that the nonrecognition of taxable gain is conditioned upon "the sole consideration" being stock or securities of Transcontinental. Consequently, if either Tex-Penn or its stockholders received anything other than Transcontinental stock or securities upon the transfer of Tex-Penn's assets to Transcontinental, they cannot qualify as coming within section 202 (b) and article 1567 and they will all be subject to tax on any gain realized. It is here that the first point of difference between the parties arises. Petitioners contend that the sole consideration for the assets of Tex-Penn was stock of Transcontinental, which stock by agreement of all concerned was issued directly to Tex-Penn's two stockholders, Benedum and Parriott. The respondent claims that Tex-Penn received as consideration for its assets not only Transcontinental stock, but also $350,000 in cash.

This difference between the parties requires an investigation into the facts surrounding the item of $350,000. There is no dispute concerning the actual payment of the $350,000 by Transcontinental to Tex-Penn; this is not only established by the evidence, but petitioners admit that Tex-Penn received the money and used at least a part of it to pay outstanding obligations. They claim, however, that the money was no part of the consideration for Tex-Penn assets, but was part of the $9,000,000 consideration for the reserved five-eighths interest in the Duke-Knoles leases owned by the five individuals, and, by agreement among themselves, was permitted to be "diverted" to Tex-Penn for the purpose of paying off that company's debts so that its assets could be conveyed free and clear of all claims.

Both parties here cite the fundamental rule that questions of taxation must be determined by what was actually done rather than by the design and purpose of the participants. *United States* v. *Phellis*, 257 U.S. 156; *Weiss* v. *Stearn*, 265 U.S. 242; *Anna M. Harkness*, 1 B.T.A. 127. The difficulty in applying this admittedly sound rule lies in the conflict in the evidence as to whether or not the $350,000 was part of the consideration for the Tex-Penn assets. Two avenues of approach are open to us in determining what was actually done. First, a study of the contemporaneous written records of the transaction, and second, an analysis of the subsequent testimony of interested parties who now contend the records are wrong.

Let us first examine the written records. On July 24, 1919, Benedum and Parriott agreed in writing with Holliday that they would cause Tex-Penn to transfer all of its properties to Transcontinental "for and in consideration of Three Hundred and Fifty Thousand Dollars ($350,000) in cash and * * * stock" of Transcontinental. On the same day Holliday addressed a letter to Tex-Penn offering to purchase all the Tex-Penn properties "for a consideration of Three Hundred and Fifty Thousand ($350,000) Dollars in cash and * * * stock" of Transcontinental. The next day, July 25, 1919, a special meeting of Tex-Penn directors was held at which it was resolved to accept Holliday's offer of purchase "for three hundred and fifty thousand dollars ($350,000) cash and * * * stock," and at the same meeting it was further resolved to "direct Mr. Holliday that the three hundred and fifty thousand dollars ($350,000) cash payable to this company, in accordance with Mr. Holliday's offer, shall be paid to the Treasury of this company." By letter of July 30, 1919, Holliday directed Transcontinental to pay $350,000 to Tex-Penn. On July 31, 1919, Transcontinental issued its check to Tex-Penn for $350,000. On the Parriott, Attorney, accounts under date of August 1, 1919, the item of $350,000 was charged to Tex-Penn and credited to Benedum and

Parriott. In the income tax return of Tex-Penn for 1919 it reported that it " sold and transferred its property to the Transcontinental Oil Company for Three Hundred and Fifty Thousand ($350,000) Dollars cash and shares " of Transcontinental stock.

There are other records showing indirectly, but none the less clearly, that at the time the deal was consummated the $350,000 cash was a part of the consideration moving to Tex-Penn and was not, as contended by petitioners, consideration to the five individuals and by them contributed to Tex-Penn. In the so-called correcting entry of December 31, 1919, in the Parriott, Attorney, accounts, it is explained that the effect of the $350,000 being paid to Tex-Penn was to reduce the " sale price " of the five-eighths interest to $8,650,000. In the statements of account dated December 31, 1919, the sale price of each individual share is shown as a pro rata portion of $8,650,000 and not $9,000,000 as it would be had the $350,000 been consideration to the five individuals. In the 1919 returns of Benedum and Parriott they reported as profit from the sales of their interests in the leases the net amounts they received out of $8,650,000.

In the face of this solid phalanx of written records describing the $350,000 as consideration for Tex-Penn assets, the petitioners stoutly maintain that the sole consideration was Transcontinental stock and that the recitals in the records are erroneous.

It may be taken for granted that Benedum and Parriott wanted, if possible, to avoid any income tax being imposed on the proceeds of the transaction. During the negotiations they were represented by an attorney who testified that he was familiar with the provisions of article 1567 and that the parties were most solicitous to keep within those provisions. In that situation it would seem obvious that all parties concerned would naturally be careful to avoid any mention of cash or anything other than stock as a consideration of the Tex-Penn assets. What, then, is the explanation for the repeated statement of $350,000 cash as consideration? The attorney who prepared the agreement of July 24, 1919, between Benedum, Parriott, and Holliday, the letter of the same date to Tex-Penn offering to purchase all of its assets, and the minutes of the Tex-Penn directors' meeting of July 25—all of which recite that the $350,000 was part of the consideration—gave as his explanation that the $350,000 was placed in the several documents through inadvertence in the pressure of matters requiring attention incident to the closing of the deal. We are unimpressed by his testimony that, " possibly as a result of talking with the bookkeeper who was tallying up the figures, that figure got into that situation as money going to Tex-Penn." It would be less difficult to accept such an explanation for an error of omission than in a situation such as exists in this case. If, as the testimony goes,

the parties carefully planned to keep cash out of the transaction between Transcontinental and Tex-Penn because of their familiarity with article 1567, it is difficult to understand how such an important change could be made in several documents through mere inadvertence, and, if so made, how it could escape detection by some of the interested parties. With respect to the minutes of the Tex-Penn directors' meeting it is carefully explained that two drafts were prepared in advance of the meeting. The first, which was not offered in evidence, it is said contained no reference to the $350,000, the testimony being that "We were most particular to avoid that particular feature." However, just before the meeting a second draft was prepared. This draft, containing the recitation of $350,000 as part consideration, became the official record of the action of the directors. The claim that this insertion was by inadvertence does not commend itself to us as a sufficient explanation. It is almost beyond belief, if the parties intended to omit reference to this peculiarly important item, and did so in the first draft, that it could have crept into the second draft solely by inadvertence, as suggested by petitioners.

It is said that the direction in Holliday's letter of July 30, 1919, to Transcontinental to pay $350,000 to Tex-Penn was given upon instructions from Parriott. This attempted explanation adds nothing to the situation. It had previously been agreed that Tex-Penn was to receive the cash, and the Tex-Penn directors when accepting the offer of purchase had adopted a resolution whereby the officers of the company were to direct Holliday that the "cash payable to this * * * shall be paid to the treasury of this company." Had Parriott instructed Holliday otherwise there might be some reason for an explanation. As the matter stands he merely carried out the previously recorded understanding of the interested parties.

Nor does Holliday's testimony to the effect that Parriott told him that the five individuals had agreed to make up a fund sufficient to clear Tex-Penn of debts, and that Parriott directed him to deduct the agreed amount from the $9,000,000, lead us to a different conclusion from that already indicated.

Though it is true that in a sense the $350,000 was to be deducted from the $9,000,000 which the individuals had at one time expected to receive, this does not establish that they were to receive the $9,000,000 in full and then pay a part of it over to Tex-Penn. The consent of the individuals to have the $350,000 deducted from their distributive shares, coupled with the definite characterization of that amount as consideration moving to Tex-Penn, indicates clearly that the individuals intended to allow a reduction by that amount in the consideration coming to them. The inference from Holliday's further testimony that the block of Transcontinental stock was the sole

consideration for Tex-Penn assets is not supported by the documents he signed at that time.

The Parriott, Attorney, book entries relating to the $350,000 are set out in the findings of fact. Petitioners speak of these entries as convincing evidence of the origin and character of the $350,000.

As we read the entries made at the time of the transaction, they properly reflect the consideration paid under the agreement that had been reduced to writing on July 24, 1919, whereby, in so far as Transcontinental was concerned, Benedum and Parriott were to get $3,400,000 and Tex-Penn $350,000. The later so-called correcting entry, instead of changing the records on this item, when read with the explanation appended, substantiates what was previously recorded, namely, that the $350,000 was consideration to Tex-Penn. The explanation is that the $350,000 by being paid to Tex-Penn had the effect of "-reducing such sale price", that is, the sale price of the five-eighths interest, to $8,650,000. The agreement among the five individuals whereby Benedum and Parriott had a right of contribution against the other three which would eventually give them more than $3,400,000 does not serve to change the consideration agreed to be paid and actually paid by Transcontinental.

It is also significant that as late as June 1920, Tex-Penn in its income tax return, signed by Parriott, reported that it had sold its assets for $350,000 cash and Transcontinental stock.

In our opinion the communications addressed by Wrather, Lantz, and Kirkland to Parriott are not decisive of the questions concerning the $350,000. Petitioners point to the letter of July 14, in which those three authorize Parriott " to apply and deduct from our distributive shares " a sufficient amount to satisfy the obligations of Tex-Penn. The only one of those three men now living, Wrather, testified that in executing the several documents in connection with the sale of their interests the three were considering only " the net results * * * the ultimate objective," rather than the details. In other words, they were not concerned with the treatment of the $350,000 as between Tex-Penn and Transcontinental as long as they received $5,250,000 less whatever amount was necessary to clear Tex-Penn of its debts. And it is to be noted that Tex-Penn and Transcontinental were not parties to any alleged agreement that a part of the consideration to the five individuals was to be diverted. The agreements on this matter were only between the individuals. This may explain why in some places in the documents it is stated that Benedum and Parriott were to receive $3,400,000 instead of the amount they actually received. Having authority from their associates to exact contributions for a pro rata portion of the $350,000, they were not particularly concerned that the consideration coming

to them was stated in an amount less than the amount they actually received. Viewed in this way there is not the inconsistency between the various written records that petitioners claim exists and which they say makes the records unreliable. But of a certainty the understanding of these three men among themselves, whatever it was, or the construction to be put on their letters, whatever it be, could not change the consideration agreed upon between Transcontinental and Tex-Penn for the assets of the latter.

Even though Benedum and Parriott, who were the sole stockholders of Tex-Penn at the time, may have had a different concept of what was intended, we cannot accept their testimony as sufficient to overcome the legal effect of the considered and recorded action of the directors of the corporation as shown on the minutes of the meeting at which they accepted the offer of Transcontinental.

As pointed out above, article 1567, upon which both parties rely as a correct interpretation of the statute, requires, as a condition of nonrecognition of gain, that the sole consideration be stock or securities, and the burden is on the taxpayer to bring itself clearly within the statute and regulations.

We have examined all the evidence on this phase of the question and in our opinion the written contemporaneous documents are a more reliable record of the true agreement of the parties than the oral testimony of what was intended. In *Georgetown Water, Gas & Electric Co.*, 28 B.T.A. 321, we said:

In a controversy of this nature what was actually done is much more important than post factor testimony to show intention not evidenced by the terms of the governing agreements. *C. W. Ray*, 19 B.T.A. 1154; *J. Hampton Hoult*, 24 B.T.A. 79. In our opinion the answer to the question here must be determined by study of the two agreements through which the transaction was effected.

The written agreements herein indicate clearly that there was a cash consideration to Tex-Penn of $350,000. We are not convinced by the oral evidence that that was not a fact. Accordingly, we hold that the petitioners have not brought themselves within section 202(b) of the Revenue Act of 1918, and article 1567 of Regulations 45, so as to escape recognition of gain.

Our conclusion that the transaction is not within the nonrecognition provisions need not rest solely on our finding that the $350,000 was part of the consideration for Tex-Penn assets. It may with reason be held that Tex-Penn stockholders received cash for their stock.

Under article 1567 of Regulations 45, which the parties agree correctly interprets section 202(b) of the 1918 Act, it is not only necessary that Tex-Penn receive as a consideration only stock or securities, but it is also necessary that the stockholders receive only stock or

securities for their Tex-Penn stock. If the stockholders receive other than stock or securities, the transaction is taxable, regardless of whether any cash passed to Tex-Penn.

When negotiations were pending with the bankers for the purpose of arranging to finance the proposed Transcontinental Co., Wrather, Lantz, Kirkland, and Parriott, under date of June 2, 1919, authorized and directed Benedum to sell the entire holdings of Tex-Penn and their individual interests in the leases for $12,000,000, which sum they agreed to accept pro rata " for their entire holdings in the Tex-Penn Oil Company as well as for their individual interests in the properties operated by said company." They thereafter executed, together with Tex-Penn, a joint conveyance of the entire seven-eighths interest in the property, which instrument was placed in escrow and was later delivered to Transcontinental, and thereby became the means of transferring and conveying to that company all interests in the Duke-Knoles leases. Although changes were made from time to time as Benedum negotiated with the bankers and Transcontinental, and he was required to forego $3,000,000 of his share in cash (apparently to be compensated for in stock), the other individuals, and particularly Wrather, Lantz, and Kirkland, persisted in their demand for their proportionate part of the sum as originally fixed. It is true the shares of Tex-Penn went to Benedum and Parriott and the reserved interests to Transcontinental, but we think it must be conceded that the sum received, particularly by Wrather, Lantz, and Kirkland, covered all their interest in the Duke-Knoles leases and Tex-Penn stock. It cannot be seriously urged that the $30 paid for the stock served to compensate them for their interest in Tex-Penn; some part of the cash from Transcontinental included payment for those shares. This was the original agreement; that amount (less the $350,000) was entered on the Parriott, Attorney, accounts as consideration for both the stock and lease interests and the receipts given for the cash acknowledged that it was in payment for both. Wrather, Lantz, and Kirkland did not consider that they were completely and irrevocably out as stockholders upon the assignment of their stock, but, on the contrary, in the event the full consideration was not paid they would resume their positions as stockholders, and they so stipulated when they assigned their interests to Parriott.

The petitioners, however, insist that effect must be given to two sales—one of the reserved interest to Transcontinental, and the other the sale of the shares of Tex-Penn to Benedum and Parriott. We are not here concerned, however, with the matter of the recognition of separate transactions, but with determining whether or not the consideration passing to Wrather, Lantz, and Kirkland was consid-

eration for both their reserved interests in the Duke-Knoles leases and their stock in Tex-Penn. To accept $30 as the actual consideration when the finality of the sale is made to depend expressly upon the receipt of $5,250,000 recited as consideration for other property, and in the face of the fact that this large sum is the exact amount formerly agreed upon as consideration for both, would require us to ignore pertinent facts indicating that the nominal consideration stated was not the real consideration. Moreover, to treat such recited consideration as the actual one, although unsupported by any fact or circumstance indicating it to be the fair consideration other than its bare recital as such, is unreasonable on its face.

The transfer of their shares in Tex-Penn by Wrather, Lantz, and Kirkland to Benedum and Parriott for the nominal sum of $30 in our opinion was obviously but a step in the consummation of the broad plan originally undertaken. The reasonable conclusion is that some part of the cash received by Wrather, Lantz, and Kirkland represented consideration for their stock. Though disposition of their stock was " in connection with a reorganization, merger or consolidation " under section 202 (b), it does not come within the nonrecognition provisions because the " sole consideration " was not stock or securities of Transcontinental as required by article 1567. Consequently, the entire transaction becomes subject to the gain or loss provisions of the statute.

### THE RESTRICTIVE AGREEMENT.

Petitioners maintain that even though the Transcontinental-Tex-Penn consolidation was outside the scope of the nonrecognition of gain provisions, no income was realized in 1919 upon the receipt of the Transcontinental stock because of the restriction imposed by the bankers against the sale or other disposition of the block of stock during the life of the bankers' syndicate.

An inquiry into the circumstances surrounding the so-called restrictive agreement leads to the conclusion that the restriction thereby imposed was not so extensive as the bare words " restrictive agreement " would indicate. It was a purely oral agreement and we must gather its full import from the testimony of several witnesses. The testimony is that the agreement was between Benedum and Parriott on the one hand and the bankers on the other. Parriott testified that in entering into this restrictive agreement he acted as president of Tex-Penn as well as individually, and it is claimed that Tex-Penn was bound thereby. It does not appear, however, that Tex-Penn as a corporation was a party to the agreement or that it ever took any corporate action recognizing in any way that it was bound. While it is recognized that the president has more or less limited

powers in respect of ordinary routine business matters of the corporation (Fletcher on Corporations, sec. 2012) certainly this rule does not extend to the imposition of a general restriction on the use of the bulk of the corporation's property. Likewise, it does not appear that Transcontinental was ever a party to or recognized the agreement. Neither of these corporations as far as the record shows placed any restriction on the use or disposition of the stock, which was constructively received by Tex-Penn and actually received by Benedum and Parriott. While these omissions in the evidence, whether they be the result of oversight or the lack of provable facts, decidedly weaken petitioners' claim of a binding restriction, we do not find it necessary to rest our decision on them.

The important point requiring decision here is the effect of the agreement on the stock in the hands of Benedum and Parriott. This question must be solved in the light of the statute, which treats as income property received to the extent of its fair market value, if any. Whether section 202 of the statute requires the fixing of some amount as a fair market value, as is necessary under other sections where that phrase occurs, does not require decision at this point. However, it would seem that the use of the words " if any " recognizes the possibility of situations where there may be no fair market value and it is perhaps that on this premise, without a critical analysis of the statute, it has been held, on a clear showing, that in fact property received had no fair market value and hence gave rise to no income. Be that as it may, for the purpose of the point before us it must be assumed that, the restrictive agreement aside, the stock had a fair market value. Otherwise we would have reached the end of the case before this.

We cannot believe that the taxing statute may be read in such a way that property otherwise having a fair market value may be said to have been deprived of that value because the owner voluntarily agrees with some other person not to dispose of it for a limited time. It would hardly be said under other circumstances that the value of property is wholly destroyed by reason of an agreement to withhold it from the market for the time being. For example, it is not at all unusual for members of a cooperative marketing organization to refrain from marketing their produce at harvest time and to agree to hold it until a specified time or until the market price reaches a certain figure. Again, if a group of manufacturers or processors agree to withhold from the market a part of their stock on hand, it would not be said that the merchandise should be written out of inventory as having no value. The settlor of a revocable trust does not destroy the value of property by placing it in trust and thereby limiting his control over it for the time being. If in such cases

market value is not destroyed, the withholding in the case of securities has even less effect because of the lack of variation between units of the article. Each share of stock withheld is exactly like each share traded in on the market. Of course, the dumping of a large block might depress the value, but each share would be affected exactly to the same extent. The resort to restrictive or withholding agreements is usually prompted by selfish motives. The party agreeing to withhold feels that he stands to gain thereby, and the result to be achieved is quite the opposite of that urged by the petitioners in these proceedings. There is evidence here that the bankers who had obligated themselves to pay $20,000,000 for 500,000 shares of Transcontinental stock would not have undertaken to do so but for the promise of Benedum and Parriott to withhold their block from the market temporarily. With the assurance given by Benedum and Parriott the bankers proceeded, as one of them put it, " to develop a market " for the stock. It was further testified that without a restriction on the large block going to Benedum and Parriott " a successful operation " in the marketing of the bankers' stock would have been impossible. As a result of the efforts of the bankers and of the 40 or 50 syndicate participants a market for Transcontinental stock was created which otherwise could not have existed and to the extent that the market for the stock was thus enlarged Benedum and Parriott reaped a benefit by withholding their stock for the time being. Petitioners ought not to be heard to say that a stand voluntarily taken to support the value of property at the same time destroys the value of that portion of the property owned by them.

We cannot believe that the Government can be deprived of its legal right to tax the receipt of property because the taxpayer, to serve some end of his own, agrees not to dispose of it immediately. He may refrain from receiving the property by contract, but once having received it and the deal having been consummated, he can not either postpone or destroy the sovereign right to tax it by agreeing not to dispose of it for a time. If this be not true, an agreement to withhold the sale of a security even for a day would destroy its fair market value. The taxing act must be regarded as operative at all times and as reaching income the moment received whether it be in the form of cash or property. The fact that the recipient of the property has agreed to limit his use of it cannot retroactively disengage the fastening of the tax upon its receipt measured by its fair market value. The phrase " if any " in section 202 (b) is designed to recognize the situation where property in fact has no fair market value and not the case where there is a present existing fair market value, but the taxpayer by his voluntary action and to serve his own ends fails to avail himself of it.

This is the view taken by the court in *Wright* v. *Commissioner*, 50 Fed. (2d) 727, where there was an agreement that certain stock was to be placed in trust for a period of five years, and it was contended that the profit could not be ascertained until the termination of that trust. The court said:

The contention on behalf of the petitioners that the taxable profit accruing to them could not be ascertained until the end of the period fixed in the trust agreement of five years is not sound. Were such an agreement held to fix the date of taxation of profits in a transaction of this kind the government would be at the mercy of the purchaser and seller in each contract of sale, and if the taxing date could be postponed for five years by such a contract between purchaser and seller, it could be postponed for twenty years.

True, in that case the trusteed stock was being disposed of by the taxpayer, rather than received as here, but the quoted excerpt from the opinion is equally applicable to either situation.

There seem to be but few cases that have dealt with the question we have here, but those that have been decided indicate a trend of decision contrary to the holding petitioners would have us make. In *Newman* v. *Commissioner*, 40 Fed. (2d) 225; affirming 10 B.T.A. 158, property was turned in to a corporation for cash and stock, and the recipient of the stock agreed with the other two holders of substantially all the remaining stock that the stock of all three was to be pooled and that none of the three would sell without the consent of the others. It was held that the pooling arrangement did not prevent the receipt of the stock from being treated as income, the court's opinion reading in part as follows:

Where a person voluntarily exchanges his property for other property under conditions that vest the power to sell the property received jointly in him and other persons, he receives taxable income to the extent of the profit derived from the transaction, if the property received has a market value and is salable by those in whom the power of sale is vested under his voluntary agreement.

Undoubtedly, in the present case, the syndicate managers might have lifted the restriction within the year, and in that view they and Benedum and Parriott were in very much the same position as the joint owners considered in the *Newman* case. In fact the syndicate agreement only provided definitely for a continuation to October 18, 1919, and according to its terms might have been terminated before that date.

In denying a petition for rehearing in the *Newman* case (41 Fed. (2d) 743) the court said:

Taxation is an intensely practical matter. Income taxes are levied upon the basis of an annual accounting period. Rates are based upon the needs of the Government for revenue and are continually changing. Annual accounting periods must be adhered to and arbitrary shifting of income from one year to another must be prevented in order to enable Congress to successfully adjust

the rates to the needs of the Government. These have become fixed requirements in federal revenue taxation. We are of the opinion that a taxpayer cannot legally avoid such requirements by the simple expedient of an agreement with friends or associates not to sell until all agree and thereby select to his own liking the year in which his tax liability shall arise.

In *Fesler* v. *Commissioner*, 38 Fed. (2d) 155 (affirming 13 B.T.A. 1356), the recipient of securities in an exchange contracted in writing not to sell, or negotiate for a sale for present or future delivery, or pledge them, for a period of six months. It was held that the securities received had a readily realizable market value within the meaning of the Revenue Act of 1921, and the court in referring to the restrictive agreement said that " this is rather persuasive of the fact that the securities had some market value " at the time of receipt.

In *Wallis Tractor Co.*, 3 B.T.A. 981, two consolidating companies received stock in the newly organized company for their assets. They agreed to retain the common stock received for a period of two years and agreed not to sell or dispose of the second preferred stock received—except to employees who must likewise agree not to sell—during the operations of the syndicate formed to market the stock of the new company. We held that in view of these restrictive agreements and the agreement of syndicate members to support the market at a certain price, the exchange quotations afforded little basis for the determination of fair market value. The case does not go so far as to hold that by reason of the restrictive agreements the stock received was not income.

In *Rodrigues* v. *Edwards*, 40 Fed. (2d) 408, it was held that stock received by an employee as compensation, which could not be sold except with the written consent of the company or its chief stockholder, constituted income. The court said in part:

The requirement of consent by a third person is not an absolute bar to negotiations * * *; on the contrary, it implies that, if such consent be secured, the stock or trust certificate is assignable.

The situation here is different from such cases as *K. E. Merren*, 18 B.T.A. 156, and *Otto Braunwarth*, 22 B.T.A. 1008, where the consideration was placed in escrow and was not to be released until a subsequent year. Here Benedum and Parriott had the consideration in their possession, subject only to a restriction as to its use, with a possibility of the restriction being lifted within the year.

The case of *Eisner* v. *Macomber*, 252 U.S. 189, much relied upon by petitioners, does not hold that that which is received must be susceptible of use in any way the recipient sees fit in order for it to be income. Nor does *Corliss* v. *Bowers*, 281 U.S. 376, so hold. There the income was subject to the taxpayer's " unfettered command " and the court merely held that such income was taxable to him. The

recent case of *Burnet* v. *Wells*, 289 U.S. 670, goes far towards pointing out the fallacy of petitioners' claim that property must be free from any restriction whatsoever before it can be treated as income under the taxing statutes. There the Court sustained the taxation of trust income to the grantor in so far as the income was used to maintain insurance on the grantor's life, and said in part:

Government in casting about for proper subjects of taxation is not confined by the traditional classification of interests or estates. It may tax not only ownership, but any right of privilege that is a constituent of ownership. *Nashville, Chattanooga & St. Louis Ry. Co.* v. *Wallace*, 288 U.S. 249, 268; *Bromley* v. *McCaughn*, 280 U.S. 124, 136. Liability may rest upon the enjoyment by the taxpayer of privileges and benefits so substantial and important as to make it reasonable and just to deal with him as if he were the owner, and to tax him on that basis. A margin must be allowed for the play of legislative judgment. To overcome this statute the taxpayer must show that in attributing to him the ownership of the income of the trusts, or something fairly to be dealt with as equivalent to ownership, the lawmakers have done a wholly arbitrary thing, have found equivalence where there was none nor anything approaching it, and laid a burden unrelated to privilege or benefit.

In this case it seems plain enough that in receiving the Transcontinental stock the petitioners acquired at least a " right or privilege that is a constituent of ownership " which may properly be treated as income to the extent of its value.

We conclude that the restrictive agreement did not operate to place the 1,007,834 shares of stock beyond the reach of the taxing statute to the extent of their fair market value at the time of receipt by petitioners.

### VALUATION OF THE STOCK.

Thus we come to the question of determining the amount of the gain realized by Tex-Penn upon the constructive receipt of the block of 1,007,834 shares of Transcontinental stock, and the amount realized by Benedum and Parriott on the distribution to them of that block of stock. Section 202(b) of the Revenue Act of 1918, above quoted in full, contains the following provision relative to the determination of gain or loss on exchanges:

When property is exchanged for other property, the property received in exchange shall for the purpose of determining gain or loss be treated as the equivalent of cash to the amount of its fair market value, if any * * *.

Our problem, then, at this point is to determine the " fair market value, if any," of the 1,007,834 share block of Transcontinental stock. In determining the deficiencies in these cases the respondent used a fair market value of $47.55. He has now abandoned that figure and asserts that the stock had a fair market value of $12 per share in the hands of Tex-Penn and $10 per share in the hands of Benedum and Parriott.

In the course of the trial of these cases, counsel for petitioners used as a test of " fair market value " the following:

By this is meant, as distinguished from intrinsic value, the fair market value then presently realizable in cash or its equivalent and ascertainable with fair certainty.

Counsel for respondent defined the term in this way:

By " fair market value " is meant a price upon which a buyer, willing but not compelled to buy, and a seller, willing but not compelled to sell, will agree, both being informed as to the property, which price is in money or its equivalent, is ascertainable with fair certainty, and is realizable within a reasonable time.

Upon analysis, the parties are not far apart in their definitions. The petitioners state that fair market value is the amount " presently realizable in cash or its equivalent and ascertainable with fair certainty," while respondent states it is the price " in money or its equivalent \* \* \* realizable within a reasonable time " and " ascertainable with fair certainty." The respondent's regulations have long defined fair market value as being " that amount which would induce a willing seller to sell and a willing buyer to purchase." Art. 201 of Regulations 45, 62, 65; art. 221, Regulations 74. The necessity that the buyer and seller be willing parties may be taken for granted as otherwise the requirement of " fair " market value would not be met. In *Andrew B. C. Dohrmann*, 19 B.T.A. 507, we said that the term means:

\* \* \* the cash price at which a seller willing but not compelled to sell and a buyer willing but not compelled to buy, both having reasonable knowledge of all the circumstances, will trade.

In that case we quoted from *Phillips* v. *United States*, 12 Fed. (2d) 598, in which it was said:

This [fair market value] may be defined to be the value of the property in money as between one who wishes to purchase and one who wishes to sell; the price at which a seller willing to sell at a fair price and a buyer willing to buy at a fair price [will trade], both having reasonable knowledge of the facts.

This definition seems to us to be the most nearly accurate of the several called to our attention and accords substantially with that of the parties.

We deem it unnecessary to discuss in detail the difference between fair market price and fair market value. The statute here involved uses only the term " fair market value, if any," and the respondent is not now claiming that the current prices at which stock of Transcontinental sold on the Curb Exchange on August 1, 1919, ranging from 47½ to 48½, represents the fair market value at that date. That there is a distinction between the terms is commonly recog-

nized. *Kountz* v. *Kirkpatrick*, 72 Pa. 376. The failure of the quoted prices to reflect fair market value, however, does not mean that the stock had no value; it simply means that resort must be had to other evidence for the purpose of determining whether such value existed and, if so, what it was. *Wallis Tractor Co., supra.* In *North American Telegraph Co.* v. *Northern Pacific Ry. Co.*, 254 Fed. 417, it is said:

> The term "market value" as the words fairly import, indicates price established in a market where the article is dealt in by such a multitude of persons, and such a large number of transactions, as to standardize the price. * * * The term is, however, frequently used in a figurative sense, as meaning the fair or reasonable value of the property—that is such a value as the property would have if it were dealt in according to the practices of a market overt.

For many weeks testimony was offered by the respective parties bearing on the value of the assets of Transcontinental, and while the fair market value of the stock may not be determined solely by reference to the value of the assets of the company, such value is a pertinent consideration in reaching the fair market value of the stock of Transcontinental. *Ray Consolidated Copper Co.* v. *United States*, 268 U.S. 373.

### Pittsburgh-Texas, Riverside Eastern, and Riverside Western Assets.

The fair market value of leases owned by Pittsburgh-Texas is stipulated to be $238,500. Evidence offered by petitioners establishes that the Boynton refinery of Pittsburgh-Texas had a value of $500,-000. The values of assets of Riverside Eastern and Riverside Western are established at, respectively, $150,000 and $233,608. The values found are those established by petitioners' witnesses and represent values of physical properties such as land, refinery, blending, and distributing stations. Nothing has been included for any intangibles in view of the poor record of earnings. Counsel for respondent says that for this reason—unsatisfactory earnings—but little consideration has been given to the assets of these companies except as they tended to round out the facilities of the new company as a complete unit in the oil industry. In view of this situation we are satisfied to accept the values above found without inquiry as to why $2,500,000 was paid to the Riverside companies and substantial blocks of stock issued to each of the three companies for assets of such comparatively insignificant value.

### Tex-Penn Assets.

The only assets of this company of value were its leases. It is stipulated that its leases, other than the Duke-Knoles leases, had an aggregate value at August 1, 1919, of $221,500.

*The Duke-Knoles Leases.*

The block of Duke-Knoles leases in Texas, covering some 3,500 to 4,000 acres of land, is the only Transcontinental asset concerning which there is serious dispute. When we speak of these leases we mean the seven-eighths working interest acquired by the five individuals in 1917 and 1918, which was later severed when a two-eighths interest was conveyed to Tex-Penn, and then in 1919 the full seven-eighths interest was acquired by Transcontinental. The petitioners contend that the leases did not, on August 1, 1919, have any " fair market value then presently realizable in cash or its equivalent and ascertainable with fair certainty." The respondent claims that the fair market value of the leases on the date mentioned was $12,000,000. The evidence entirely convinces us that the Duke-Knoles leases did have on August 1, 1919, a very substantial market value and we have so found in our findings of fact.

Undoubtedly the men who discovered and developed the Duke-Knoles Pool (or Desdemona Field as it was later called) were of the opinion throughout the year 1919 that the Duke-Knoles leases were tremendously valuable. They negotiated for the sale of the leases on the basis of a value of $12,000,000 and the testimony of Wrather is that that figure, prorated among them according to their individual interests, gave them "substantially what we thought we should have." True, the sum originally demanded was later reduced, but the reduction came out of Benedum's share and the others each received an amount equal to the share he was entitled to out of the original price of $12,000,000—less the $350,000 hereinbefore discussed. Benedum's loss in cash by reason of the reduction in the total cash price was presumably made up by his receipt of Transcontinental stock. At the time of organization of Transcontinental it was expected that the main source of supply of crude oil would be the Duke-Knoles Pool. This pool was described by Parriott in a letter to the bankers as " one of the most prolific pools of high grade oil ever discovered," and he predicted that within a few weeks, upon completion of facilities then under construction, earnings would be in excess of $25,000 per day. Both Benedum and Parriott, in their income tax returns for 1919, filed in 1920, reported that at the time the discovery well came in the field was estimated among oil men "to be worth from $12,000,000 to $18,000,000," and they reached the figure of $15,000,000 " as representing a true value from conditions arising within thirty days after the drilling in of Duke No. 1, the Discovery Well of the Field." The same statements were made in a schedule attached to the return of Tex-Penn which Parriott executed as president. These statements were made in connection with depletion deductions based on discovery value, which under

the statute (secs. 214 (a) (10) and 234 (a) (9)) meant "fair market value of the property at the date of discovery, or within thirty days thereafter." Benedum, Parriott, and Wrather all appeared as witnesses at the first hearing in these proceedings, but not at the second hearing, which was devoted largely to the question of value of the Duke-Knoles leases, although as far as we know all were available. No attempt was made by petitioners to reconcile their expressed 1919 opinion of the value of the leases with the entire lack of worth for which they now contend.

We have set out at some length in our findings the history of the discovery and development of the Duke-Knoles leases, the conditions as they existed at August 1, 1919, and some of the subsequent developments which tended to confirm in some instances, and to contradict in others, opinions based on known conditions at the basic date. We need say but a few words on this. There is no doubt that surface indications pointed to at least a possibility of the Duke-Knoles leases being extremely valuable. They were favorably located from a geological point of view. Of the 12 wells drilled prior to August 1, eight showed an initial production of oil, and on that date five of these were actually producing oil. One of the wells, Knoles No. 1, was an unusually large well, having an initial production in December 1918, of 500 barrels, and after being deepened in January 1919, it had an initial of 6,000 barrels. Another well within the borders of the Duke-Knoles block, but owned by another company, came in with an initial production of 1,000 barrels. From November 1918 through July 1919, the wells on the Duke-Knoles leases produced 421,137 barrels of oil. There was a strong demand for oil and the price was high—$2.25 per barrel, and before the close of 1919 it went to $2.50. From the time the discovery well came in, September 1918, through at least the early months of 1919, there was feverish activity among lease buyers throughout the entire Desdemona district.

On the other hand, to the student of conditions facts were available which detracted somewhat from the optimistic predictions based solely on obvious conditions such as above outlined. It had been ascertained that the entire field was decidedly "spotty", that is, it was not at all unusual to have a dry hole adjacent to a large producer, and because of this condition there was no reasonable assurance that production would be obtained at any point. Perhaps the most serious condemnation of the field was the rapid rate of decline of the producing wells. The rapidity of the decline was known prior to August 1, 1919, and is shown clearly in the tabulations appearing in the findings of fact. For instance, the largest well, Knoles No. 1, with an initial production of 6,000 barrels in

January 1919, had an average daily production of only 448 barrels in July 1919. The next largest well, Duke No. 1, with an initial production of 600 barrels, was not producing in July. The Duke well of the Magnolia Petroleum Co., which was within the Duke-Knoles tract and produced initially 1,000 barrels in January, produced only 80 barrels in July.

By August 1, 1919, the trend of development in the Desdemona Field was definitely to the north of the Duke-Knoles leases. This result was occasioned by the fact that larger wells were brought in to the north, partly in and near the town site of Desdemona, rather than on or near the Duke-Knoles leases. Wells drilled in other directions around the Duke-Knoles leases were either dry holes or gas wells, or produced too small a quantity of oil to be profitable. By August 1, 1919, a number of locations in the field had been abandoned and in some cases rigs were torn down without drilling. While it appears that lease-buying activity continued until some time after August, it also appears that the leases which changed hands related to areas comparatively small with relation to the Duke-Knoles tract and varied in distance from three quarters of a mile to five miles or more from the Duke discovery well.

While these factors no doubt were discouraging and served to temper the over-optimism that had prevailed by reason of the patently favorable conditions, we cannot but believe that the Duke-Knoles leases had a very substantial value when acquired by Transcontinental. We cannot close our eyes to the fact that here was a large producing field located favorably for the production of oil, and that there was a strong demand for oil at the highest price quoted in many years. Nor can we cast aside the expressed opinions, near the basic date, of the men who discovered and helped develop the field, and the very substantial sum for which they sold their interests. It is our studied conclusion that the Duke-Knoles leases had a substantial value which may properly be taken into consideration in determining the fair market value of Transcontinental stock.

### Other Assets of Transcontinental.

The bankers were obligated to pay Transcontinental a total of $20,225,000 for the stock they had agreed to take. Of this sum Transcontinental in turn was obligated to pay $11,500,000 for the properties of Tex-Penn, Pittsburgh-Texas, and the two Riverside companies, thus leaving in the Transcontinental treasury $8,725,000. This had not been paid in full on August 1, but the petitioners make no claim that the commitment was not worth its full face value. At August 1, Transcontinental had cash on hand in the amount of $27,697.39, which apparently came from some source other than the

bankers. Consequently on August 1, 1919, Transcontinental had available for its own use cash and other liquid assets with a cash value of over $8,750,000. The fact that this money was a part of the working capital of Transcontinental, available for the further development and acquisition of properties, makes it none the less an element of stock value. It is not to be presumed that the directors would squander the money, but rather that they would exercise sound judgment in its disbursement.

### Value of the Stock.

Both parties called expert witnesses to testify as to the fair market value of the 1,007,834 shares of stock with which we are concerned. On the one side, petitioners' witnesses gave it as their opinion that the stock had no fair market value, while those testifying for the respondent fixed the fair market value at about $12 per share if unrestricted and $10 per share subject to the restrictive agreement. In *James Couzens*, 11 B.T.A. 1040, where expert witnesses called to value the stock reached widely varying results, we remarked that the conflict of opinion and the diversity of reasoning applied demonstrated that the problem of valuation has not been developed to the extent that any particular method of reasoning is authoritative or any particular class of persons recognized as experts. Where men of sound judgment, having the same facts before them, reach such widely varying results it becomes our duty to undertake independently the problem of fixing the fair market value of the stock. This is a task involving the weighing of many factors and circumstances. It is an undertaking that may not be accomplished by the simple application of a chosen formula to the facts and figures at hand. It is not a mere matter of mathematics. As said by the Supreme Court in *Standard Oil Co.* v. *Southern Pacific Co.*, 268 U.S. 146, "the ascertainment of value is not controlled by artificial rules. It is not a matter of formula, but there must be a reasonable judgment having its basis in a proper consideration of all relevant facts."

In *James Couzens*, *supra*, we said:

The method of valuation is in itself unimportant, so long as it gives due regard to all the facts and relevant evidence, and results in a value which has a reasonable relation thereto. There may be no slavish adherence to a formula, *Minnesota Rate Case*, 230 U.S. 352; *Georgia Ry. Co.* v. *R.R. Comm.*, 262 U.S. 625, and whether the method should proceed from a definite study of, say, original cost, see *Donaldson Iron Co.*, 9 B.T.A. 1081, or cost of reproduction new less depreciation, see *Paducah Water Co.*, 5 B.T.A. 1067, and compare *Rockford Malleable Iron Works*, 2 B.T.A. 817, or from general opinions of qualified witnesses, or from book value, or from recognized market quotations or other data. must depend upon the nature of the property under consideration and the extent to which such evidence bears a relation to its value. Moreover, since it is the stock we are considering and not the corporation's tangible or in-

tangible assets, we are not directly concerned with a method, like, for instance, that set forth in A.R.M. 34, 2 C.B. (1920) 31, for arriving at the value of good will or other intangibles separately from the tangible or other assets, or a method for classifying or segregating the constituent parts which are reflected in the value of the stock representing the whole. [p. 1162.]

The determination of fair market value requires the application of judgment to proven facts. Established facts are precise, but inferences drawn therefrom vary widely. It is chiefly in the formulation of inferences that opinions vary. And it is in the reasonableness of inferences that the soundness of judgment shows itself. If the judgment applied to the facts be sound the result is reasonably accurate; if it be faulty the result will be correspondingly inaccurate.

We deem it unnecessary to this report to restate the facts in detail or to review and criticize the opinions of the many witnesses called by the parties. In the findings of fact agreed values are indicated for certain assets. As to the Duke-Knoles leases, after careful study of the facts and opinions presented, we are convinced that they possessed a subtantial value. In arriving at the value of the stock we have given such weight as in our judgment should be given, to the several factors bearing thereon. We do not assign a specific value to each nor do we rely solely on the value of the assets. In the formation of a judgment of value the length of each step taken in reaching the ultimate result may not be measured with nicety nor can the weight of each contribution be precisely determined. The value which we have found is less than that asked by the Government, much less than the market price, and far less than the optimistic opinions of petitioners as expressed at about the basic date. It represents our reasoned judgment of the fair market value of the stock after studied consideration of all pertinent facts and applicable factors.

Approaching the problem at hand in the light of these somewhat obvious observations, considering, testing and weighing the manifold facts in evidence, and the inferences to be drawn therefrom, and applying to the task our best judgment based on experience in many cases involving similar questions, we have determined that the fair market value of the stock of Transcontinental Oil Co. received by petitioners in the transaction before us was $7 per share.

THE MINOR ISSUES.

*Benedum's Riverside Western Preferred Stock.*

Petitioner Benedum alleges that respondent erred in computing the gain, if any, derived from the retirement of his Riverside Western preferred stock. There is no question as to the amount received by Benedum upon the surrender of this stock in 1919. It was $25

per share for 5,589 shares, making a total of $139,725. The question is as to the cost basis, the respondent having assigned to the stock a cost of $15 per share.

As set out in the findings of fact, Benedum acquired 740 shares by purchase in the market for $13,260.64, making an average cost of a trifle under $17.92 per share. The balance of the stock was acquired from the Riverside Western in units, each unit consisting of one share of preferred and one of common at an average price of $25 per unit.

No common stock was ever issued separately for cash but was issued as a bonus with the preferred. Both classes of ·stock were closely held and there is a record of only a few isolated sales in 1916 and 1917 when Benedum acquired his stock. The prices paid on such sales are not in evidence.

The 740 shares purchased by Benedum in the market should undoubtedly take cost as the basis. Section 202 (a) (2), Revenue Act of 1918. As to those shares, a recomputation using cost as the basis is directed.

As to the remaining stock, petitioner has not shown that respondent erred in allocating to it a cost of $15 per share. Article 39 of Regulations 45 requires that the purchase price "be fairly apportioned" between the classes of stock, and only where it is impracticable to make such allocation is recognition of gain postponed until recovery of total cost. One witness testified that upon an examination of brokers' records listing transactions in the stock it was not possible for him to make an allocation between the two classes of stock. This does not establish that an allocation was impracticable. The respondent's action here is in harmony with the decision in *Collin* v. *Commissioner*, 32 Fed. (2d) 753, in which the court, upon finding that some part of the purchase price was paid for the common stock, remanded the case for further hearing to determine whether it was "practicable to obtain data or facts upon which a fair apportionment" might be made. In *Kirkland* v. *Commissioner*, 57 Fed. (2d) 608, it had been stipulated that it was impracticable to apportion cost, and the court held that the taxpayer was chargeable with taxable gain only after he had recovered full cost.

In this case the petitioner's evidence is insufficient to overcome the prima facie correctness of respondent's determination, and on this point the respondent must be sustained. Moreover, the prices paid by Benedum on his cash purchases of preferred stock indicate that respondent's allocation is not far out of the way.

*Parriott's Pittsburgh-Texas Stock.*

By amendment to his petition, Parriott alleges that respondent erred in finding that he received in 1919 certain Transcontinental

stock as a liquidating dividend from Pittsburgh-Texas Oil & Gas Co., and further erred in finding that gain was derived from the alleged receipt of the stock.

At the hearing counsel for Parriott conceded that in 1919 he received 455⅚ shares of Transcontinental stock by reason of his ownership of Pittsburgh-Texas stock, and the parties stipulated that " the consideration for the transfer by the Pittsburgh-Texas Company to the Transcontinental Oil Company in 1919 of all of its assets, consisted of 158,833 shares of Transcontinental stock, and such stock only."

There is no question as to Transcontinental's acquisition of the Pittsburgh-Texas assets being in connection with a reorganization under section 202 (b), and, as the sole consideration was stock, the transaction comes within article 1567 and results in no gain to either Pittsburgh-Texas or its stockholders. Decision on this point is for petitioner.

#### Limitation of Surtax.

In determining the deficiencies asserted against Benedum and Parriott, the respondent applied the 20 percent surtax limitation under section 211 (b) of the Revenue Act of 1918 to the gain that he determined these petitioners realized on the sale of their reserved interests in the Duke-Knoles leases. By amended answers counsel for respondent asserts that it was error to apply the limitation and asks for increased deficiencies by reason thereof.

Section 211 (b) of the statute provides as follows:

In the case of a bona fide sale of mines, oil or gas wells, or any interest therein, where the principal value of the property has been demonstrated by prospecting or exploration and discovery work done by the taxpayer, the portion of the tax imposed by this section attributable to such sale shall not exceed 20 per centum of the selling price of such property or interest.

Counsel for respondent argues that the instrument of October 31, 1918, by which a two-eighths interest in the leases went to Tex-Penn was technically an instrument of assignment or sale, as distinguished from a sublease, and the individual lessees thereby parted with their property interests in the leases. Under the instrument of October 31, 1918, there was reserved to the individual lessees something more than the mere royalty right of an assignor. There was reserved to them a five-eighths interest in the production. Throughout the trial of these cases the interest reserved to the five individuals has been regarded as a substantial property interest and in our opinion it is properly to be treated as an interest in oil or gas wells within the meaning of the statute. Cf. *Palmer* v. *Bender*, 287 U.S. 551, holding that for purposes of depletion the distinction between the interest of an assignor and a sublessor is unimportant.

It is further contended by the respondent that the principal value of the property was demonstrated by discovery work of Tex-Penn rather than by the individual lessees. It is established beyond question that the individuals made a discovery within the meaning of the statute in what had theretofore been wildcat territory. True, a larger well was thereafter brought in by Tex-Penn, but this alone does not establish that the principal value was attributable to that well rather than to the earlier discovery well. The burden of proof on this issue rests on respondent and he has not sustained it to the point of convincing us that he erred in applying the provisions of the statute limiting the amount of surtax.

*Miscellaneous.*

In the petitions of Benedum and Parriott they allege error on the part of respondent in failing to allow as an ordinary and necessary expense any amount for certain Transcontinental stock set aside by petitioners as compensation for services to employees of Transcontinental. They allege that they set aside a block of 99,500 shares, of which Benedum contributed 59,078 and Parriott 40,422. The respondent denies error in this respect and denies the facts alleged. No mention was made of this question either in oral argument or in petitioners' briefs, from which it would appear that if they did not intend to abandon it they at least are not disposed to urge it seriously. In any event, the evidence is insufficient to support their claim. The only evidence offered by petitioners on this point is the testimony of one witness that out of the block of 1,007,834 shares of stock, 284,375 shares were delivered to and retained by Parriott, that Benedum and Parriott jointly delivered 99,500 shares to a so-called employees' fund, and that the balance went to Benedum. This obviously does not establish the right to a deduction.

Reviewed by the Board.

*Decision will be entered under Rule 50.*