WILBUR F. BURNS, PETITIONER, ET AL.,[1] *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 36661, 36793–36797, 36799, 36800, 36805, 36807, 37042, 37758.
Promulgated March 27, 1934.

---

[1] Proceedings of the following petitioners are consolidated and decided herewith: Elizabeth B. Dickson; Edgar W. Bassick; Tracy C. Dickson, Jr.; Marshall M. Bassick; William A. Schenck; William Roscoe Bassick; F. C. Bassick; Edgar Webb Bassick, Jr.; Jessie S. Perkins; South Side Trust & Savings Bank of Chicago, Illinois, Administrator of the Estate of Francis E. Bade; and Norman W. Cummins.

*Louis B. Eppstein, Esq.*, for the petitioners in Docket Nos. 36661, 36793–36797, 36799, 36800, 36805, 36807, 37042.

*Ewing Everett, Esq.*, for the petitioner in Docket No. 37758.

*W. Frank Gibbs, Esq.*, for the respondent.

#### OPINION.

Murdock: The Commissioner determined deficiencies in income taxes of the respective petitioners for the year 1923 as follows:

| Docket No. | Petitioner | Deficiency | Docket No. | Petitioner | Deficiency |
|---|---|---|---|---|---|
| 36661 | Wilbur F. Burns | $18,010.91 | 36799 | William Roscoe Bassick | $14,447.41 |
| 36793 | Elizabeth B. Dickson | 9,181.63 | 36800 | F. C. Bassick | 18,243.81 |
| 36794 | Edgar W. Bassick | 85,100.54 | 36805 | Edgar Webb Bassick, Jr | 8,981.83 |
| 36795 | Tracy C. Dickson, Jr | 447.24 | 36807 | Jessie S. Perkins | 1,685.99 |
| 36796 | Marshall M. Bassick | 8,934.52 | 37042 | Francis E. Bade | 2,778.64 |
| 36797 | William A. Schenck | 7,321.71 | 37758 | Norman W. Cummins | 3,345.06 |

The proceedings have been consolidated. The parties have stipulated most of the facts, although the testimony of several witnesses and certain documentary evidence also were introduced. Some of the issues raised by the pleadings are disposed of by the agreed facts and require no discussion. The principal question remaining for consideration is whether, under the provisions of section 202 of the Revenue Act of 1921, any gain shall be recognized on an exchange by the petitioners in 1923 of common stock of the Bassick Co. for cash, bonds, and promissory notes in amounts admitted to be the equivalent of

cash, and certificates of deposit and voting trust certificates representing shares of the common stock of the Bassick-Alemite Corporation; and, if so, the amount thereof. This issue is common to all of the proceedings. In Docket No. 36661 a separate issue is presented of the amount to be reported by Burns on the installment basis as profit realized by him from a subsequent sale of certificates of deposit received in the exchange. A summary of the stipulated facts will be sufficient for present purposes.

Edgar W. Bassick (hereinafter referred to as Bassick) and the other petitioners were in 1922 and 1923 holders of common stock of the Bassick Co. Its outstanding capital stock consisted of $1,274,000 of preferred stock and 30,364 common shares, each having a par value of $100. The common shares owned by the petitioners had a basis of cost to them of $90 per share, except that 118 of the shares owned by Bassick had a total cost basis to him of $4,580. In 1922 and 1923 the Bassick Manufacturing Co. had outstanding capital stock consisting of 15,000 common no par value shares. The Bassick Co. owned 10,000 and D. F. Fessler and C. I. Overton owned 5,000 of these shares. In 1922 Bassick entered into negotiations with the Central Securities Co. (hereinafter referred to as the bankers) for the organization of a new corporation to acquire the 5,000 shares of Bassick Manufacturing Co. stock owned by Fessler and Overton and not less than 90 percent of the common shares of the Bassick Co. They agreed that the new corporation should acquire the 5,000 shares of the Bassick Manufacturing Co. from the bankers, who were to purchase them from Fessler and Overton, and that it should acquire the shares of the Bassick Co. from or through the efforts of Bassick, at a price of $131.75 per share, payable at the option of the Bassick Co. stockholders either all in cash, or one half in cash and one half in no par value common stock of the new corporation at $20 per share, which stock was to be stamped, or otherwise made subject to an agreement that it could not be marketed except through the bankers for a limited period, and with certain price restrictions, the details of which were later to be definitely fixed. Bassick procured from the holders of 95 percent of the common stock of the Bassick Co., including these petitioners, agreements to transfer their shares to the new corporation at a price of $131.75 per share, in which they indicated their preference for payment in cash in full, or one half in cash and one half in stock. He also procured for the bankers an option to purchase the 5,000 shares of the Bassick Manufacturing Co. Thereafter, on January 27, 1923, Bassick and the bankers entered into a contract in which they agreed: (1) That Bassick should organize a corporation in Delaware with an authorized capital stock consisting of preferred stock of the par value of $5,000,000, and 200,000 shares of common stock without par value;

(2) that the new corporation should issue $1,250,000 in notes, payable over a period of years and secured by a collateral trust indenture to the Central Trust Co. of Illinois, as trustee, under which all of the stock to be acquired by it should be pledged; (3) that Bassick should assign to the new corporation at least 95 percent of the common stock of the Bassick Co. in exchange for the $1,250,000 of notes and the percentage of 147,500 common shares of the new corporation that the number of the Bassick Co. shares delivered bears to the total outstanding common shares of that company; (4) that the bankers should thereupon assign to the new corporation 5,000 shares of the Bassick Manufacturing Co. in exchange for 52,500 of the common shares of the new corporation; (5) that Bassick should then sell or cause to be sold to the bankers from 65,000 to 72,500 common shares of the new corporation at $20 per share, payable in cash as follows: $400,000 upon consummation of the agreement, $350,000 on January 1, 1924, and the remainder on July 1, 1924, the two deferred payments to be evidenced by interest-bearing promissory notes of the bankers, secured by a collateral trust agreement covering, in addition, a third note of the bankers payable to their nominee for $400,000, due January 1, 1924; the trust agreement to provide for the deposit of the 52,500 shares of the new corporation acquired by the bankers, subject to release to them upon payment of $20 per share, and to provide also for the pledge of the rights of the bankers under a certain syndicate agreement; (6) that the bankers should transfer and deliver to Bassick United States Government bonds of the market value at date of delivery of $1,050,000 in exchange for the $1,250,000 of notes of the new corporation; (7) that 50,000 of the shares of the new corporation received by the bankers, and 50,001 of such shares received by the stockholders of the Bassick Co. should be deposited under a voting trust agreement for the protection of the note holders; (8) that all of the stock of the new corporation acquired by Bassick or the stockholders of the Bassick Co. not sold to the bankers, should be deposited by them with a trust company, subject to an agreement that it should not come into their possession until January 1, 1924, without written consent of the bankers, to the end that it should not be placed upon the market for sale in the interim.

On February 7, 1923, Bassick organized the Bassick-Alemite Corporation (hereinafter referred to as the Alemite Co.) under the laws of Delaware, with an authorized capital stock consisting of preferred shares of the par value of $5,000,000, and 200,000 common shares without par value. On February 13, 1923, the Alemite Co. was authorized by its directors and stockholders to enter into a contract with Bassick for the acquisition from him and the other owners of 30,358 shares of the common stock of the Bassick Co. in

exchange for 147,500 shares of the common stock and $1,250,000 of collateral trust serial gold notes of the Alemite Co. secured by a trust indenture to be executed by the latter to the Central Trust Co. The contract provided that 29,754 shares of the Bassick Co. should be delivered immediately, and that the remaining 604 shares should be delivered within 60 days, with the right on the part of Bassick, in the event he should be unable to acquire the 604 shares from the owners, to pay the Alemite Co. for each share not delivered $131.75, either in cash or in common stock of the Alemite Co. at $20 per share, or " partly in one way and partly in the other "; and that Bassick should assign 50,001 shares to trustees under a voting trust agreement, in order to carry out the covenants of the Alemite Co. contained in the trust indenture referred to above and to protect the note holders and secure a satisfactory management of the Alemite Co. The directors authorized the issuance to Bassick of the 147,500 shares of stock and $1,250,000 of notes, and the execution of a trust indenture to the Central Trust Co. pledging thereunder all of the stock of the Bassick Co. and the Bassick Manufacturing Co. acquired or to be acquired by the Alemite Co. They also authorized the entry of the Bassick Co. stock on the books at a value of $5,380,000.

On February 14, 1923, Bassick, on behalf of himself and other stockholders of the Alemite Co., entered into an agreement with the bankers and the Central Trust Co., whereby, in consideration of the purchase by the bankers from Bassick and such stockholders of certain shares of Alemite stock, the latter agreed to deposit certificates for 32,499 other shares of said stock issued in their names with the Central Trust Co., to be held by the latter as trustee for the term of the agreement, so that the said shares should not be sold, offered for sale, or otherwise placed on the market.

The agreement provided that the trustee should issue and deliver to each stockholder or depositor receipts or certificates for the aggregate number of shares of Alemite stock belonging to him, in the following form, and that each person, by his acceptance of such receipt, should be bound by the agreement.

No. ———                                              Shares ———

BASSICK-ALEMITE CORPORATION

Receipt for Common Stock deposited under agreement of February 14, 1923.

The undersigned hereby certifies that it has received from _____ a certificate or certificates representing ____ shares, without any nominal or par value, of the common capital stock of BASSICK-ALEMITE CORPORATION, which said certificate or certificates are deposited with the undersigned under the provisions of an agreement with respect to said certificates, dated February 14, 1923, executed by and between the undersigned and E. W. Bassick, for and on behalf of himself and other depositors, and Central Securities Company, to which reference is hereby made, and which is hereby made a part hereof as

fully as though set forth at length. The said certificates so deposited are by the terms of said agreement deliverable, upon the surrender of this receipt, to said _____ or his legal representatives on January 1, 1924, or on such earlier date as may be fixed by the Central Securities Company, one of the parties to said agreement; it being hereby agreed and understood that neither this receipt nor the common stock certificate or certificates represented hereby, nor the right to receive said common stock certificate or certificates under the provisions of said agreement, nor any right or interest therein, or in respect thereto, shall be assignable except by operation of law.

Dated _____.

CENTRAL TRUST COMPANY OF ILLINOIS

By _____

*Assistant Secretary.*

The agreement provided that on January 1, 1924, or on such earlier date as might be fixed by the bankers, the stock certificates should be delivered to the depositors or their legal representatives upon surrender of the receipts; and it contained the following provision:

\* \* \* It is expressly understood and agreed that such receipts so issued, as aforesaid, shall inure only to the benefit of the respective Depositors and their legal representatives, it being especially understood and agreed that no Depositor shall have any right to assign said common stock certificates, or any interest therein, or his right to receive the same under the provisions of this agreement, and that all rights therein or in respect thereto shall be assignable only by operation of law.

As part of the marketing program for the stock to be acquired by them, the bankers had, on December 23, 1922, entered into a syndicate agreement with certain individuals providing for the sale by the bankers to the syndicate of so many of the shares of Alemite stock to be acquired by the bankers (not exceeding 125,000) as the aggregate amount of subscriptions would purchase at $20 per share, and that the syndicate managers, at any time prior to January 10, 1924, could sell all or any part of the stock received under the agreement at any price not under $20 per share.

On February 14, 1923, Bassick, individually, and the bankers entered into a " stock trust agreement " which provided for the assignment and transfer to certain individuals, as trustees, of 100,001 shares of the common stock of the Alemite Co., which stock was to be held and voted by the trustees until termination of the trust on February 1, 1928, or such earlier date as might be set by the trustees or other designated persons. The agreement provided that the trustees should issue to persons designated by Bassick and the bankers " stock trust certificates " setting forth the number of shares of stock to which the holder would be entitled at the expiration of the agreement, and that, upon its expiration and surrender of the certificates, the trustees should deliver corresponding certificates for shares of

the stock then standing in the names of the trustees. It also provided that the certificates should be issued in the following form:

BASSICK-ALEMITE CORPORATION

Number                                                         Shares

————                                                     ————

Common Stock Trust Certificate issued under Agreement
dated February 1, 1923

This is to certify that on the first day of February, 1928 (or on such earlier date as the Trust Agreement hereinafter mentioned shall be terminated), —————————— will be entitled to receive a certificate or certificates for —————— fully paid shares, without any nominal or par value, of the common capital stock of Bassick-Alemite Corporation, and in the meantime to receive payments equal to the cash dividends, if any, collected by the undersigned Trustees or their successors upon a like number of shares of such stock standing upon the books of said Company in the names of said Trustees or their successors (less expenses, if any, incurred by said Trustees under the Trust Agreement hereinafter referred to): and until after the actual delivery of such stock certificates the said Trustees and their successors shall possess and shall be entitled to exercise all rights of every name and nature in respect of such stock, including the right to vote for any purpose and to consent to any corporate act, it being expressly stipulated that no voting right passes by or under this certificate or by or under any agreement, express or implied. For any stock dividends received by said Trustees or their successors the holder hereof shall receive a stock trust certificate similar in form to this stock trust certificate for his proportionate share thereof. This certificate is issued under and pursuant to the terms of a certain Trust Agreement of date February 1, 1923, entered into by and between Joseph E. Otis, E. W. Bassick and Fred W. Shibley, as Trustees, of the first part, and certain other subscribers to said Agreement, of the second part, a counterpart of which Trust Agreement is lodged with the undersigned agent of said Trustees.

The trust created by said Trust Agreement expires on the first day of February, 1928, or on such earlier date as may be fixed in the manner provided in said Trust Agreement. This certificate is transferable only on the books of the undersigned Trustees by the registered holder, either in person or by attorney duly authorized, according to the rules established for that purpose by said Trustees, and on surrender hereof, and until so transferred the Trustees may treat the registered holder as the owner hereof for all purposes whatsoever, except that delivery of stock certificates hereunder shall not be made without surrender hereof.

Pursuant to agreements authorized by the Alemite Co. on February 13, 1923, Bassick delivered to that company all of the common stock of the Bassick Co. and received therefor 147,500 shares of its common stock and its notes of the par value of $1,250,000. On February 14, 1923, he deposited the stock and notes so received with the Central Trust Co. with instructions to deliver the notes to the bankers and receive from them United States bonds of the market value of $1,050,000; to deliver 65,000 shares of Alemite stock to the bankers and to collect from them $400,000 in cash and their notes

in the amount of $900,000; and to issue receipts and voting trust certificates for the Alemite stock deposited and transferred under the agreements of February 14, 1923. He also instructed them as to the amount of cash, notes, bonds, certificates of deposit, and voting trust certificates which were to be distributed or issued to the respective stockholders of the Bassick Co. The instructions were executed and, prior to February 20, 1923, the Central Trust Co. made distributions to the stockholders of the Bassick Co. The number of shares of Bassick Co. stock owned by the petitioners and the amount of cash and other property received by them in the transaction were as follows:

| Petitioner | Number of Bassick shares | Cash received | Notes of the bankers | Government bonds | Voting trust certificates | Certificates of deposit |
|---|---|---|---|---|---|---|
| Wilbur F. Burns | 974 | $164.50 | $32,000 | $32,000 | | 3,208 |
| Elizabeth B. Dickson | 1,000 | 90.00 | 32,500 | 33,300 | 3,203 | |
| Edgar W. Bassick | 11,524 | 27.00 | 406,500 | 421,400 | 30,801 | 3,717 |
| Tracy C. Dickson, Jr | 100 | 95.00 | 3,200 | 3,300 | | 329 |
| Marshall M. Bassick | 1,000 | 90.00 | 32,500 | 33,300 | 3,293 | |
| William A. Schenck | 948 | 59.00 | 31,200 | 31,200 | | 3,122 |
| William Roscoe Bassick | 1,790 | 92.50 | 61,300 | 61,300 | 4,657 | 1,000 |
| F. C. Bassick | 1,991 | 34.25 | 70,000 | 70,000 | 4,664 | 1,450 |
| Edgar Webb Bassick, Jr | 1,000 | 90.00 | 32,500 | 33,300 | 3,293 | |
| Jessie S. Perkins | 254 | 144.50 | 8,000 | 8,600 | | 836 |
| Francis E. Bade | 365 | 48.75 | 12,000 | 12,000 | | 1,202 |
| Norman W. Cummins | 375 | 24,706.25 | | | | 1,235 |

The bankers acquired the 5,000 shares of the Bassick Manufacturing Co. at a cost of approximately $701,000, and, pursuant to contracts made on February 15, 1923, the Alemite Co. issued 52,500 of its common shares to the bankers in exchange for the 5,000 shares of the Bassick Manufacturing Co., upon condition that the bankers deposit 50,000 of the Alemite shares under the stock trust agreement of February 14, 1923. All of the foregoing transactions were concluded on or about February 17, 1923. The parties stipulated at the hearing that the notes of the bankers and the Government bonds received were the equivalent of cash.

The petitioners reported no gain from the transaction in their returns for 1923. The Commissioner determined that the petitioners received Alemite stock having a readily realizable market value of $20 per share and computed a profit on the basis of the difference between the amount of cash, bonds, notes, and stock received, and the basis of the Bassick Co. stock ($50 and $55 per share; and $4,580 for 118 of the shares owned by Bassick), and, as the profit so computed exceeded the amount of the cash, bonds, and notes received by each of the petitioners, he determined the taxable gain to be only so much of the profit as was not in excess of the amount of the cash, bonds, and notes received. Sec. 202 (e), Revenue Act of 1921, as amended March 4, 1923.

The petitioners contend first that immediately after the exchange of the Bassick common stock for 147,500 shares and notes of the Alemite Co. the Bassick group owned all of the issued and outstanding stock and was in control of the Alemite Co. within the intendment of section 202 (c) (3) (B) of the Revenue Act of 1921, and that, therefore, no gain or loss can be recognized on that exchange. They say that it was only after such exchange had been completed and the 147,500 shares and notes had been deposited with the Central Trust Co. that the remaining 52,500 Alemite shares were issued to the bankers in exchange for 5,000 shares of the Bassick Manufacturing Co. While the evidence shows that Bassick delivered the Bassick Co. stock and received Alemite Co. stock and notes therefor two or three days before the bankers received any Alemite Co. stock, yet the Bassick group was not in control within the meaning of the statute. The delivery of the Bassick Co. stock and the receipt by Bassick of Alemite Co. stock and notes of that company was but an intermediate step in a plan comprehending and requiring numerous other steps, including transfers, assignments, sales, exchanges, and trust agreements, to which the bankers, the Alemite Co., and the trustees, as well as the Bassick group, were parties. The plan contemplated that the Alemite Co. should acquire not only the stock owned by the Bassick group, but also the 5,000 shares owned by Fessler and Overton, for which it was to issue all of its 200,000 shares. All of the agreements were so interlocked and interdependent that the plan would have been entirely frustrated by the failure of the parties to proceed beyond the step relied upon. The plan as agreed upon and as executed within a few days provided that the Bassick group should dispose of its stock for $131.75 per share, payable from an aggregate of cash, bonds, and notes of the bankers of the total value of $2,350,000, and 82,500 Alemite shares subject to the provisions of the trust agreements of February 14, 1923. The plan further provided that the Alemite Co. was to have outstanding 200,000 common shares and $1,250,000 in notes, and was to be the owner of the common stock of the Bassick Co. and of one third of the stock of the Bassick Manufacturing Co. The bankers were to be the owners of 117,500 shares of Alemite Co. stock and of $1,250,000 of the notes of the Alemite Co. The 147,500 shares of Alemite Co. stock were delivered to Bassick subject to the obligation to sell 65,000 of those shares to the bankers for cash and notes, to exchange $1,250,000 of notes of the Alemite Co. for $1,050,000 of bonds, and to deposit or transfer the remainder of the Alemite Co. shares under the trust agreements. Without the performance of these conditions, the preliminary agreements with the Bassick stockholders wherein they agreed to accept $131.75 per share, payable in cash, or in cash and stock, could not have been complied with, for no cash could have

been available until the bankers had acquired the 65,000 shares. In addition, the bankers expected to receive 52,500 other shares direct from the Alemite Co., which, together with the 65,000 to be purchased from Bassick, were a necessary part of their plan to market about 125,000 shares. These could not have been acquired except by the issuance of the entire 200,000 shares. Their purpose was to control the Alemite Co. themselves, for a limited period, and manifestly such control could not have been exercised without the issuance of the 52,500 shares. The various steps were inseparable, incomplete parts of a single plan. It has been held, in applying the provisions of section 202 (c) (3) (B), that the question of control is to be determined by the situation existing at the time of the completion of the plan rather than at the time of the fulfillment of one of the intermediate steps. *West Texas Refining & Development Co.*, 25 B.T.A. 1254; affd., 68 Fed. (2d) 77; *Erle P. Halliburton*, 25 B.T.A. 1045; *Omaha Coca-Cola Bottling Co.*, 26 B.T.A. 1123; *Prairie Oil & Gas Co.* v. *Motter*, 66 Fed. (2d) 309; *American Security & Trust Co.* v. *Tait*, 5 Fed. Supp. 337. Certainly here there was not the required control when Bassick received the 147,500 shares, since he had to go through with the plan in order to carry out his agreement with the stockholders of the Bassick Co. After the consummation of the transaction the Bassick group owned less than 80 percent of the total outstanding 200,000 shares of the Alemite Co., and hence was not in control of such company immediately after the transfer of the Bassick stock to it. The petitioners' first point is not well taken.

If the hypothesis, that an exchange by the Bassick group was a separate and independent transaction and that the 147,500 shares and $1,250,000 in notes were received tax-free, were accepted as correct, it would not necessarily establish that the petitioners realized no taxable gain on this transaction in 1923. After acquiring such shares and notes, the Bassick group sold 65,000 shares for $1,300,000 and exchanged the notes for $1,050,000 of bonds. What part of the 65,000 shares and notes was owned and disposed of by each of the respective petitioners is not shown by the record. If the petitioners' contention were correct, it would merely show that the Commissioner's method was incorrect, but the record would still fail to show that the deficiencies determined by the Commissioner were incorrect or what the correct deficiencies on this theory would be. *F. G. Bishoff*, 6 B.T.A. 570; affd., 27 Fed. (2d) 91; *Louis Friedman*, 21 B.T.A. 38; *Lake Charles Naval Stores*, 25 B.T.A. 173; *Saxman Coal & Coke Co.* v. *Commissioner*, 43 Fed. (2d) 556.

The petitioners contend next that the certificates of deposit and the voting trust certificates had no readily realizable market value. The respondent replies that they had a readily realizable market

value of $20 for each share represented—the value he used in determining the deficiency. The respondent takes the position in his brief that section 202 (c) (2) is not determinative in this case, but there was gain which is recognized for tax purposes under the latter part of section 202 (e),[2] as amended March 4, 1923. He states that the property acquired was acquired in a reorganization, but argues that since it consisted not only of stock of the Alemite Co., a party to the reorganization, but also of cash and bonds and notes of the bankers, admittedly the equivalent of cash, the gain is taxable to the extent of the amount of the cash, bonds, and notes received. Although the Commissioner states that there was a reorganization and the petitioners do not argue that there was not a reorganization, yet the transaction was not a reorganization, a merger, or a consolidation within the commonly accepted meaning of those terms. It was not a merger or consolidation within the rule of *Pinellas Ice & Cold Storage Co.* v. *Commissioner*, 287 U.S. 462; nor does it fall within the parenthetical clause of the definition contained in section 202 (c) (2). Cf. *Minnesota Tea Co.*, 28 B.T.A. 591. The transaction involved the creation of a new corporation and the mere acquisition by it, from the owners, of one third of the stock of the Bassick Manufacturing Co. and of all of the common stock of the Bassick Co. The new corporation acquired none of the assets of either of the old ones, and the latter continued in business. Both before and after the transaction the Bassick Co. had outstanding $1,274,000 of preferred stock, and, whether this was voting stock or not, a majority of it was not acquired by the new corporation. *Thomas H. Redington*, 25 B.T.A. 707. Thus, the latter part of section 202 (e) would not apply.

However, we need not decide that there was no reorganization. The respondent now agrees that the Bassick stock had a cost basis of $90 instead of $50 and $55. A recomputation of the profit on the basis of a corrected cost of $90 and a readily realizable market value of $20 per share for the Alemite stock received in the case of each petitioner, will result in a profit not in excess of the amount of cash, bonds, and notes received, and the gain to be taxed will be the same whether it be computed as in the case of an ordinary exchange, or under the provisions of section 202 (e) on the theory that there was a reorganization.

The petitioners claim that the certificates of deposit and voting trust certificates had no readily realizable market value. They do

[2] Sec. 202 (e). * * * when property is exchanged for property specified in paragraphs (1), (2), and (3) of subdivision (c) as received in exchange, together with money or other property of a readily realizable market value other than that specified in such paragraphs, the amount of the gain resulting from such exchange shall be computed in accordance with subdivisions (a) and (b) of this section, but in no such case shall the taxable gain exceed the amount of the money and the fair market value of such other property received in exchange.

not dispute that both classes of certificates had some so-called intrinsic value. They rely on the restriction upon alienation appearing on the face of the certificates of deposit and on opinions of experts to show an absence of market value. They say that the restriction stamped upon the certificates had the effect of definitely closing to them the market on an open exchange, because, in any sale of the stock upon such an exchange delivery of the certificates of deposit would not be good as a delivery of the stock. They do not contend that the sole criterion of marketability is whether or not securities are marketable upon an open exchange, but assert that inability to deliver securities under transactions concluded upon such an exchange definitely closed to them that particular market. Without the testimony of the experts we have no proof that such certificates would not be acceptable upon sales of stock effected on such an exchange. But even though they are not deliverable, we need not decide whether the closing of a particular market would deprive the certificates of a readily realizable market value. Whether the restriction operates to prevent sales in a particular market or in all markets, it does not establish the absence of a readily realizable market value. The obstacle to a prompt and easy realization of an amount of cash or its equivalent commensurate with the fair market value of the property was the restriction itself, which was not an inherent attribute of the property received, but a mere contractual obligation not to exercise an owner's right of disposition. *T. W. Henritze*, 28 B.T.A. 1173. In the *Henritze* case the taxpayer received certificates of stock containing restrictions on the face of the certificates, while here the petitioners deposited certificates of stock and received from the trustees evidence of their stock ownership in the form of certificates of deposit. They did not assign the stock or transfer their title, but only parted with possession of the stock certificates. The arrangement did not otherwise affect their inherent rights as stockholders, and, as in the *Henritze* case, they were stockholders bound by contract not to sell. As to such restrictions, imposed both by oral and written contracts, it has been held, in cases wherein the restrictions were not incorporated in the stock certificate, that they do not deprive the stock of either fair market value or readily realizable market value, if it otherwise has such value. *Newman* v. *Commissioner*, 40 Fed. (2d) 225; *Fesler* v. *Commissioner*, 38 Fed. (2d) 155; certiorari denied, 281 U.S. 755; *Tex-Penn Oil Co.*, 28 B.T.A. 917, 961–966.

The experts testified, however, that the certificates of deposit and the voting trust certificates had no readily realizable market value. They stated that their conclusions were unaffected by the fact that unrestricted stock of the Alemite Co. was being sold on the Chicago Stock Exchange. It might be noted in this connection that the com-

mon stock of the Alemite Co. was listed on the Chicago Stock Exchange on February 23, 1923; it was offered to the public on the following day at $27.50 and was actively traded in thereafter; during the first week 11,240 shares were traded in and the price rose to $29 by March 1; the market was maintained at gradually increasing prices until the middle of April 1923, at which time the price ranged from $36 to $37.50; in March 1923, when the stock was selling on the exchange at $34, Bassick sold 2,407 shares, represented by certificates received by him, to some old employees of the Bassick Co. for cash and deferred payments; the total sale price amounted to $48,140, or $20 per share, and was received by him in 1923; in April 1923 representatives of the marketing syndicate offered to buy from the holders of certificates of deposit 10,000 additional shares at $32 per share; the offer was accepted; and, so far as the record discloses, the petitioners Wilbur F. Burns, F. C. Bassick, and William Roscoe Bassick availed themselves of it to the extent of 3,208, 1,450, and 400 shares, respectively, and the employees who acquired shares from Bassick, to the extent of 862 shares.

These witnesses had had wide experience in stock market operations and in the purchase and sale of stocks. However, they had no actual knowledge of the certificates in question, of the stock represented by them, or of the assets and financial condition of the Alemite Co. Upon a mere reading of a copy of a certificate of deposit they stated that under no circumstances could there be a market or a readily realizable market value for such certificates, because by their very terms they could not be transferred without the consent of the bankers. They also testified that the voting trust certificates had no market value and no readily realizable market value, because a market would have to be created for them, and, while an " over-the-counter " market might be created, the expense, time, and uncertainty involved in such an operation, and the arbitrage between the unrestricted stock and the voting trust certificates, would militate against any efforts to create one. These certificates, unlike the certificates of deposit, bore no restrictions upon alienation and by their terms were transferable. They represented an interest in stock which was assigned to trustees to protect the note holders and assure to the bankers control of the Alemite Co. for five years. The trustees during that period enjoyed voting power and all the incidents of ownership, except the right to part of the cash dividends, which were to be paid to the certificate holders. The latter had the right to receive corresponding stock certificates at the expiration of the trust period. This right was at least a right or privilege that is a constituent of ownership which may be taxed to the extent of its value. *Burnet* v. *Wells*, 289 U.S. 670; *Tex-Penn Oil Co.*, 28 B.T.A.

917, 966. The testimony of the witnesses as to these certificates is also based upon a mere examination of a copy of one of them, and goes no further than to assert that they could not be sold on a public market or exchange. The witnesses do not claim that no one would buy them or that they had no intrinsic value.

Fair market value or readily realizable market value does not necessarily imply that there must be a market on a public exchange. *Lyle H. Olson*, 24 B.T.A. 702. Whether a security has a readily realizable market value is a question of fact to be determined from all of the circumstances, *Herbert W. Eldredge*, 18 B.T.A. 194; and in order to have such value it must be practically the equivalent of cash and capable of easy and prompt realization, *Alexander D. Falck*, 26 B.T.A. 1359; *Edwin W. Eisendrath*, 28 B.T.A. 744; *Fesler* v. *Commissioner*, 38 Fed. (2d) 155. The opinions of witnesses on questions of value are to be judged in accordance with the reasoning which is disclosed, *H. H. Blumenthal*, 21 B.T.A. 901; and we are not bound to accept them if they are contrary to our best judgment. *Joseph S. Wells Assn.*, 28 B.T.A. 271, 275; *Uncasville Mfg. Co.* v. *Commissioner*, 55 Fed. (2d) 893; certiorari denied, 286 U.S. 545. The testimony is predicated entirely on considerations which we regarded as insufficient to establish absence of a fair market value in the *Henritze* case. Furthermore, we find in this record other evidence which in our opinion not only overcomes the conclusions of these witnesses but corroborates the correctness of the respondent's determination. In the very transaction which gives rise to this controversy the parties thereto dealt with the certificates of deposit and the voting trust certificates as the equivalent of cash to the extent of $20 for each share represented. The Bassick stockholders sold their stock for $131.75 per share, with the option of receiving payment in cash or one half in cash and one half in Alemite stock at $20 per share subject to the provisions of the trust agreements. The total purchase price amounted to $4,000,000, of which $2,350,000 was paid in cash or its equivalent and $1,650,000 in Alemite stock at $20. While the cash was not sufficient to pay all in cash, in the actual distribution some of the stockholders received one half in cash and one half in certificates, some received more than one half in cash and the remainder in certificates, and others received all cash. The amounts distributed to all stockholders is not in evidence, but the stipulation discloses that at least three of the stockholders, not petitioners here, received $131,750 in cash for 1,000 shares. Also, in the contract between the Alemite Co. and Bassick for the acquisition of 30,358 shares of the Bassick Co., the Alemite Co. agreed to accept from Bassick $131.75 per share for each of 604 Bassick shares not delivered, either in cash or in common stock of the Alemite Co. at $20 per share. All the parties knew

that the shares were to be subject to the restrictions upon sale or the obligation to deposit or transfer them under the voting trust agreements. The parties apparently considered a certificate as the equivalent of $20 in cash. We are unable to say, upon a careful consideration of the expert testimony, that it has the force of overcoming the prima facie correctness of the respondent's determination, and, upon the entire evidence, and particularly that showing acceptance of the certificates by the Bassick stockholders in lieu of cash, we hold that the stock as represented by such certificates had a readily realizable market value of $20 per share. See *Frank J. Vlchek*, 7 B.T.A. 1244; *Alby W. Stegall*, 24 B.T.A. 1231.

There remains only the issue as to the gain taxable in 1923 to petitioner Wilbur F. Burns upon the sale in that year of 3,208 Alemite shares represented by certificates of deposit received in the distribution to the Bassick stockholders. It is stipulated that they were sold to the bankers for $102,656, under a contract dated April 19, 1923, providing for payment of $2,656 in cash upon execution of the contract, and five payments of $20,000 each at stated times in 1924; and that Burns received payment in accordance with the contract. In determining the deficiency the respondent computed a profit on the sale in the amount of $53,956 and included that amount in the income of Burns for 1923. The respondent now concedes that the sale was an installment sale and that, by reason of the retroactive provisions of section 1208 of the Revenue Act of 1926, Burns is entitled to return the profit on the installment basis. The profit should therefore be recomputed on the basis of $20 per share in accordance with section 212 (d).

In connection with the sale in 1923 by Bassick of 2,407 Alemite shares to employees at $20, the parties have stipulated that practically all of the proceeds, or $48,140, was received by Bassick in 1923, and that, if the transaction affects his personal return, that amount may be considered as having been received in 1923. In determining the deficiency the respondent diminished the cost basis of these shares by the excess of the profit not to be reported on the exchange of his Bassick stock (computed on a basis of $50), and arrived at a cost basis for the Alemite shares of $16.6546, and a resulting profit of $8,052.38, which was included in the return. As the use of the corrected basis of $90 for the Bassick stock and a value of $20 for the Alemite stock received will result in a tax on the entire profit from the first exchange, the basis of the shares sold to employees is $20, and there was no gain from this transaction.

Reviewed by the Board.

*Decision will be entered under Rule 50.*